Did I say that right, or is it wrong? I don't accept anything that's inappropriate. I know how you feel. Good morning, Your Honors. We are here on review of a summary judgment issued to FEA by the District Court in a remanded proceeding. In order to sustain that summary judgment, FEA must establish in this de novo review that there were no genuine issues of material fact to be before the Court. That were the foundation of the judgment, and that has to take into account the usual rule that any inferences reasonably drawn are drawn in favor of the non-moving party. Second, whatever the facts are that are undisputed, they have to show that they were entitled to judgment as a matter of law on those facts. And that means taking into account established case law, as well as the rulings of this Court in the prior adjudication we call Oberg 2, because there have been two prior rulings by this Court. So in that framework, we approach the four questions that this Court has looked at, the so-called four-factor test of Hoover. The first of those factors was, will judgment be paid by the State? And that was expressly how the Court framed that question in Oberg 2, and we believe that's law in this case. What we have indicated before and what the Court has agreed with is the State has no legal obligation to pay a judgment against FEA. It so states in its legislation, and it says that FEA's obligations by legislation should be paid out of FEA's monies. What the record has supplemented showed is that that is always the way it's been done. Historically, and this has been an organization in being for a long time, the State has never paid a judgment on behalf of FEA. FEA has paid judgments on its own. Sometimes it's paid them out of funds that it draws out of the bond trust that it manages. Sometimes it pays them out of its discretionary account. There's no record of the State ever paying a judgment, and the statutes are to the contrary, and the Court so held. FEA's argument, and the District Court agreed, was that there's a functional liability. That's a concept which has been mentioned in some of the case laws, but where it's been mentioned, it arises from an inevitable impact on the State's budget, because the 11th Amendment, after all, is about protecting the State against being bankrupted or affected in its operations by a judgment against something that's a State entity. With respect to the functional liability, I think the record showed there was no real risk that the State would be called upon, and no record to indicate that the State would, in the event that there was a huge judgment of some kind, be required to pay it. In the cases that happen in the circuit with so-called functional liability, you can start with Hutto. In Hutto, the question was, well, if the State is not legally obligated to pay a judgment against a retirement fund, is it functionally obligated? The State Constitution of South Carolina, in that case, required that any deficit in that fund be made up by the State, and the Court weighed that and said to reconcile those two propositions in State law, there appears to be a direct impact on the State's financing by any judgment or series of judgments that would put the retirement fund in jeopardy. In Ellerbee, which is the Maryland Stadium Authority case, the Court addressed the situation at the University of Maryland, which was receiving annually appropriations from the State, and therefore whose financial dealings became an immediate matter of State concern, because to the extent that they were not raising funds on their own, or they were incurring expenses by judgment or otherwise, the State's obligation to fund would inevitably increase. In Risto, which is the third of these cases, what happened there was we were talking about the ports, and the State had a long record of direct support and paying for capital improvements, and so the Court believed that any impairment of the entity's financial situation would be made up by the State. There's no showing of that kind here. There's nothing to indicate that the State would step up in the sort of hypothetical extreme case and pay for its obligations. So I think that the first factor rests where it rested in Oberl, too, which is it's heavily in favor of Dr. Oberl. The second factor, the one that I think the Court felt deserved a more intense scrutiny by record, is the degree of autonomy which FIIA exercises. Now, when we looked at the record over the long course of FIIA's dealings, and especially post-1988, a period of 27 years, FIIA basically runs its own show. Its management has fiscal autonomy. They raise ample funds to do whatever they want to do. They set their own budgets. They control their own staff. So in any meaningful day-to-day sense, the record's clear. They are operating autonomously. What about the requirement that the Attorney General review all contracts in excess of $20,000? What does the record show how that plays out in every day? Well, in every day, what's clear is the Attorney General has considered that role to be one of form. The Attorney General does not use it as a control of the business activities of FIIA. The Attorney General looks if it's properly documented, if there's some violation of general state rules. But the Attorney General has disavowed any ability to control the business activity to impair the autonomy. In the same way that the treasurer of the state, who has to formally approve withdrawals of FIIA's funds from their segregated accounts, has the same ability to decide what role to play, and that role is, again, a formal role. If it's properly documented, business judgment doesn't come into it. So if the question is, what's your autonomy? How do you run your business? Neither the Attorney General nor the treasurer has any impact on FIIA's business operation. They've expanded it. They've changed their lines of business. They've done an enormous job of changing this organization from an administrator of state grant funds to a major financial player, and that's where 90% of their effort goes, and they've done that without any substantive interference. They had a pretty major audit, though, in 2008, did they not? They had an audit because they had created a scandal by the way they were running expenses. Well, that aside, the state was at that point attempting to exercise, was it not? Well, they made some suggestions. They audited to find out what was going on, but FIIA is subject to audit by private parties as well who worry about their financial stability. So that was the one instance in which the state audited, but it doesn't regularly audit, and after that they conducted another one, and I don't think that shows that the state was trying to redirect the business activity. They were trying to discipline some of the expenses. The one thing that resulted from that, the treasurer would not pay for alcohol at lunch. That's about the extent of what happened. There's no record that their business judgments or activities were in any way subject to the audit. It was all about expenses and scandal, and it was scandalized. There's no doubt about that because the state, after all, is the owner, and the owner was a little bit concerned about the way the management was playing, but if you're looking at the real-world question, is this entity autonomous in its business activities, its ability to raise money, to set its own budget, to decide its own lines of business are clear from the record. So I think as the record's been supplemented, what was a margin, I think fairly said victory in Oberg 2, Dr. Oberg has now become a substantial victory on the second factor. So then we go to the third factor, and the third factor is whether the entity addresses state or non-state concerns. In Oberg 2, there was a decision resolving the question whether focus on out-of-state concerns, activities serving interests outside the state, was to be taken into account. Spheer's position that that was only state versus local, that was what the factor was. This court said, no, out-of-state concerns matter. We're looking at what you are doing, what interests are you serving by your activities. At that point, we had alleged that 30% of Spheer's earnings were made out-of-state in the period 2002 to 2006, which is the record period. The court expressed some doubt that that could have been the majority of their activities. When we went back into discovery, what was established in discovery was the majority of their revenues and profits were out-of-state, based on activities outside the state. Does that matter if they're brought back into the state? Yes, I believe it does matter, because the focus is what interests are you serving? But if you're going out-of-state to make money to bring all of it back into the state, why wouldn't that be a relevant consideration in the state interest factor? Well, I don't believe it is for this reason, because then it's always true that if the state owns the enterprise, it can go off and do anything and say, well, we're doing it for profit. Ergo, the state is always served. The money will always come back into ownership, but the courts have not indicated that to be the primary factor. In the same way, the state could operate a local concern and say, well, you know what? It's still bringing money into the state, because the state coffers are enriched. So the mere fact that you can go and make a profit someplace else really doesn't satisfy the question, is this the kind of activity, the kind of interest that the state of Pennsylvania wants to serve? Right now, the fee is serving the federal government. It's acting in the interest of the federal government. During the relevant period, it was acting in the interest of students all over the country, banks all over the country. It's a secondary market. It's a primary market. That's the interest that we're focused on. Is that Pennsylvania's interest? Is funding students in the Caribbean Pennsylvania's interest? Now, if it were profitable, the profits come back. I don't think one is disputing that the state owns it, but that can't be the test, or else it would all be over when you say the state owns it. But at least that, I think, is the way the case law reads on that factor. And the fourth factor is the treatment by the state. There are all kinds of recitals that wrap the state around fiat. That's early on. That's an old statute. Fiat was a very different organization at that time. The cases that were cited, the Pennsylvania state cases that were cited, those cases were all decided at the point in time where fiat was receiving state appropriations. That ended in 1988. There's not a case after that time that deals on a state level with the treatment of fiat. Fiat operates at arm's length from the state. They negotiate with the state over advancement of funds. And in that regard, it's hard to believe that the state has really invested its dignity in fiat. Oh, my gosh, though. I mean, there's certainly arguments on the other side, and we'll get to them, but I'm against the other side's position. But on the state treatment factor, doesn't fiat have around 2,400 employees or so? Well, they have employees who are divided up. And they're entitled to state retirement benefits? Yes. I mean, that's a multibillion-dollar commitment that they're making. So it seems to me you've got some much better arguments on these other factors. And we don't contend to be as strong as fact, but I think there are at least arguments on our behalf on that because the state does allow fiat to do business as American education services, as federal loan education services. In other words, it is allowing fiat to disassociate itself from the state. And so just a couple of more things that have come up in the briefing I'll just mention briefly. One thing that's come up is the so-called commingling of funds. Fiat funds are deposited, or some of them, a majority of them, in the state treasury. They are clearly fiat funds. They're segregated. For certain investment purposes, the state treasurer invests funds that are at his disposal. That doesn't change the segregation. All proceeds of that so-called commingling go to fiat to the extent that it's part of it. And it's no different from any other depository, a bank, a mutual fund. When they take your money, they don't put it in a lockbox. They commingle it, invest it, and account for it as your money. And I think that the record's clear. It is fiat money. It is totally under fiat control as the statute provides. And one other question has been, well, who appoints all the directors? The directors are appointed by statute. But one thing has come out in the record. That is the directors are not responsible to a political entity. The legislative directors once elected don't function as legislators. And the state courts have said that. They're now in their personal capacity with a duty, a fiduciary duty to fiat, not a duty to be instructed. And there have never been instructions from the legislature as such to those board members who are appointed by the legislature. So that has not become a matter of veto or control. And the governor has said expressly, I don't affect the affairs of fiat. I have no power over fiat. Does appoint four directors, but that's a small minority of the board. And he doesn't in any sense exercise control. So I see that I have a little bit of time left, so I will stop there and reserve the rest. Thank you. Thank you. Mr. Clement? Good morning, Your Honors, and may it please the Court. Paul Clement for the Pennsylvania Higher Education Assistance Agency. After exhaustively considering the relevant facts that have now been developed at this court's instructions, the district court here came to the rather unsurprising conclusion that my client, the Pennsylvania Higher Education Assistance Agency, is an arm of the Commonwealth, as Pennsylvania had intended from the very beginning over five decades ago. Now, I think just as a matter of context, it's worth recognizing that this case does not present the harder questions under the arm of the state doctrine, such as the situations when you have a regional or countywide agency that the state nonetheless treats as a state agency or a bilateral compact. This is clearly a state-level agency, and I'll talk more about it when we run through the factors, but there is no question that the state of the Commonwealth of Pennsylvania views this as a state agency discharging statewide functions. And in that context, with all due respect, it would be rather remarkable for a federal court to conclude that an entity that the Commonwealth of Pennsylvania clearly views as an arm of the Commonwealth is nonetheless not an arm of the state for purposes of 11th Amendment immunity doctrine. I also think one other point of context, Your Honor, my friend on the other side likes to focus like a laser beam on the servicing and guaranteeing operations of FEA. But I do think that, I mean, you know, FEA either is an arm of the state or it's not. And I think in considering its statutory mission, it's worth recognizing that the loans are at most sort of half of the picture here, because one of the real ways that the agency provides higher education assistance for people in the Commonwealth of Pennsylvania is by providing almost 200,000 grants to students within the Commonwealth each year. And that money, the lion's share of that money is in fact appropriated by the legislature. And then this agency administers that program and goes through the process of getting that to the individual recipients as you would expect from an agency. And of course, its role is not limited to the major grant program. There are all number of grant programs that get created on an ongoing basis by the legislature, everything from dealing with the nursing shortage to providing special educational opportunities for military veterans. Those are all administered on an ongoing basis by the state agency as a state agency. So I think with that context, I'm certainly happy to talk about the factors that this court has articulated in a variety of cases, including Hutto and Oberto and Hoover. But I do think a bit of context is important, because I think there may be a tendency in some of these cases to apply these four factors in a way that we sort of lose the thread of the broader point here, which is unlike a case like Cash, for example, where this court found a county school board was not an arm of the state. This is undeniably a statewide agency that in many of its operations, including administering these grants programs, operates just undeniably as an arm of the state or an arm of the commonwealth. Now, as to the factors in some of the things that Mr. Ryan has said, I want to be very clear that on the functional liability point, I do think the record here is considerably different from the way this case looked when all you were dealing with is the bare statutes and the allegations and the complaint. I think the critical thing here that has emerged in the discovery is two things that are related. One is that it is clear, and this is, you know, I think generalities don't help us here. I mean, I think it's important to get to the specifics of who said what on the record. And Mr. Gunther, who is the CFO of FEA, made unambiguously clear that any judgment in this case or cases going forward would be paid out of FEA's fund at the state treasury. So these funds are going to be coming out of the state treasury in a check that says Commonwealth of Pennsylvania on it. Now, to be sure, it is going to be coming out of the ELAF, the specific fund that FEA maintains at the treasury, but that has to be taken into context of the other state agencies, many of whom also have these same kind of segregated funds. And so it also has to be put in the context of this court's cases. Excuse me, I didn't mean to interrupt you there, Mr. Clement. Do any of the other state agencies have a similar statute affecting them saying that no obligation of blank agency shall be a debt of the Commonwealth of Pennsylvania? I'm not aware of another agency that has that specific provision, but I do think that the critical thing is that that really goes to the legal liability. And as to the functional liability, I think you look at that separately, and that's certainly what the cases suggest. And I think what's critical, and this is the second point that I think has emerged in discovery, is Mr. Ryan wants to say that, you know, this can come out at the whim of FEA, and that's just flat wrong. Once these monies are deposited into the treasury, they are commingled with other funds for investment purposes, and then before anything can come out, there has to be the approval of the Treasury Department. And that approval, there is testimony in the record, and this is the Craig Declaration. The testimony in the record is clear that the process for dispersing FEA's funds is the exact same process for every other agency of the Commonwealth. So that money gets put in there when essentially the check's clear from a client, it goes into the segregated account at the Commonwealth Treasury, but it doesn't come out without the approval of the Commonwealth. And Mr. Ryan tells you, oh, well, that's pro forma. Well, two things are important. He can characterize it any way he wants, but the record reflects both the Craig Declaration and Gunther's declaration and deposition testimony both make clear that it's not a pro forma review process. But I think second and, frankly, more important, the testimony in the record is absolutely clear that it is the exact same process as for every other agency of the Commonwealth. Although that may be true that it's functionally the same as others, but as Judge Keenan asked you and you responded, that there's no other agency that has a directive that says the debts will not be burden of the state. Can you cite any functional difference in terms of being responsible for liability? You're right that it's the same in terms of in and out and whether or not there are subcategories of a treasurer, but what functional aspect do you have that they may be responsible for ultimately a liability? Well, two things, Your Honor. One is, you know, Mr. Rod said there's nothing that suggests they would be functionally liable. He's wrong about that. What there's nothing of is any evidence to the contrary in this record. The only evidence in this record that addresses the hypothetical question of what happens if there is a judgment that's larger than one that FIA can pay out of its immediate resources, which this Court said in Hutto is the relevant question, the only testimony of that is from the chairman of FIA, Mr. Adolph, and he has a declaration in this case, and he specifically said that in that instance the legislature would step in. Now, the only response they have to that testimony, that's in the declaration, they decided not to take his deposition, that's in that declaration. Their only response to that is, well, it's speculative. Well, of course it's speculative. We're talking about a hypothetical question. Mr. Ryan also says, well, there's been no judgment that has been paid, judgment debt that's been paid by the Treasury. That's because, as far as I'm aware, there's been no judgment debt against the agency in its history. So we're dealing with a need to speculate here. Now, he talks about some payments out of some other funds. Those were settlements, and they were settlements, I think, in every case that were actually done before the matter got to litigation. So those are distinguishable. What's not distinguishable is the emphatic record testimony of Mr. Gunther to the effect that this judgment will be paid out of the Treasury funds. And I hope I'm being responsive here. I want to emphasize, though, that when you're thinking about the 11th Amendment and the purposes of it, I think the fact that the check is going to be cut out of the Treasury has to have significant influence on the question, even putting to one side the statutory language you've alluded to, because that's the core purpose of the 11th Amendment. And then when that's backed up with the testimony of Mr. Adolph, which is the only testimony on point on what is admittedly a speculative question, it seems to me that the answer on the functional liability is relatively clear. But there is a second thing that I want to emphasize, and that gets back to this idea that you can't just focus on the loan servicing and guaranteeing activity of FIA because they do have this grant program. And this grant program is done through appropriations by the legislature. Now, it is true that since roughly 1988, this agency hasn't had the need for appropriations for its operating expenses, which, honestly, I think we ought to be celebrating a government agency that actually can turn a profit as opposed to requires continuing appropriations for its operations. But be that as it may, it's important to keep in mind that there are continuing appropriations every year for the grant program. But those appropriations reflect the fact that right now, over the past significant number of years, what's happened is the total amount of the grant program is the sum of what is appropriated and what FIA contributes to that. Mr. McLintock, at the outset, you rightly said we need to put this into context. So in the gestalt of all of this in terms of the state agency, why would the state put this agency on the island by themselves as this firewall saying, look, at bottom, we are not going to be responsible for any liability. And you said that's the only agency. Could that be because they knew they were going to be involved in sort of speculative, not speculative, but at least more far-flung, not in the sense of around the country and doing those things? We don't want, we need that firewall. No, I don't think that's the explanation, Your Honor. And the folks on the other side are the ones that say, well, you know, this mission has changed kind of categorically over time. I don't think that's true. But I think the language that this court focused on is this 51043. That's been in there since the very beginning. And so from the very beginning, when they were doing predominantly loans and grants to Pennsylvanians, they put that language in there. Now, I don't have a reverse crystal ball. I don't know exactly why it got in there. It may have been that when you're dealing with something like loans, where you're going out into the financial markets, you have an interest in trying to use that kind of more corporate-sounding language. Then maybe the, you know, I'm not aware of another locus of that exact language in Pennsylvania law. It's very similar to the language that was in the law in Hutto that this court had before. It was the same. Now, Mr. Ryan correctly points out there were other provisions of South Carolina law that put it into context. But in a way, you know, there you're dealing with a retirement fund. I think that's another situation where you're going out into the market. So you have a state agency that, you know, puts in that more corporate language. But I don't think there's nothing in the case law I think that suggests that that's just positive of the inquiry. And that's why I think the functional liability part has to be a separate inquiry from the legal liability part. And I think that for the reasons that I've just explained, I think the functional liability, the record here, is much more robust in showing there is functional liability. And if I could just finish the one point I was making before I go on to the second, third, and fourth factors, which I think more strongly favor my client. But I do think it's worth recognizing that the sum total of grants that are going to these students are what is appropriated by the legislature every year and then an amount that's been roughly $75 million for a couple of years that FEA itself contributes. Now, if FEA has to pay a $75 million judgment, I mean, that piece of the contribution is going to go away. And the choice that the legislature is going to have to make at that point is going to be do we appropriate a larger sum, you know, $75 million more and keep the funding level constant, or do we take a hit? I think either way, you're going to have a complete and profound impact on the Commonwealth that is exactly the kind of impact that the 11th Amendment is going to try to protect against. And now, I don't have a crystal ball on this either, but I imagine Mr. Rahn would come back and say, well, but the Hess case says that that doesn't matter. I don't think that the Hess case can be read for that broad proposition. I think what was going on in the Hess case was because you had a bilateral compact, you had the unique effect that a negative effect was going to affect New Jersey a little, it was going to affect New York a little, and who knows how that would all play out. I think this court recognized in its Risto decision, which was GVR'd in light of Hess, but involved a single state port authority, the South Carolina Port Authority. There, I think it recognized, wait a second, if there is an impact against the port authority, it's going to directly affect the operations of the state of South Carolina. I think the exact same thing is here. Now, it may be true that in the Risto case, there was more of an ongoing need to put money into the operations of the port authority, but I don't see why that makes any difference, because you have the state on an annual basis continuing to make these appropriations for the grant program that unambiguously serves the interests of students in Pennsylvania, and if $75 million goes away from that, which fee has been contributing, the state is going to face exactly the choice, do we keep the level constant and put in $75 million more, or do we take a hit that the 11th Amendment is supposed to protect against. So let me go to the second factor, if I may. Now, Mr. Ryan says that FIA runs its own show, and I think my clients really have trouble swallowing that, because they live in the real world that is supported by the record evidence, not these vague suggestions that everything is pro forma. So the world they live in is one where, in order for them to contract, in order for them to put a property and buy a property, for example, if they wanted to, or any contract over $20,000, they have to get the approval of the Attorney General. And even that $20,000 limit, I think it's important to recognize, is not some special deal for FIA because they have more autonomy. That is the statewide agency policy. So the Attorney General has made clear that, look, if it's less than $20,000, we're not going to necessarily review all of those contracts as a matter of course. But agency-wise, through the same process for each agency, we're going to look at every contract more than $20,000. Now, here again, Mr. Ryan wants to say, well, that's pro forma. But there's evidence on this, and the evidence of this is Mr. Swartley, who is the General Counsel of FIA, who has to deal with the Attorney General on this. And then there is Mr. Moll, who's the Deputy Attorney General. So we have both sides of the equation, and both of them say this is not a pro forma process. But even more important here again, this is the process that the Commonwealth uses for every agency in approving their contracts. So although it might look on the face of the statute, which of course is all this Court had before it in OBERG II, that this agency stands apart from every other agency, in practice, as to both disbursements from the Treasury Department and for contract approval processes, the testimony in the record, which is completely unrebutted, is the process is exactly the same for this agency as any other arm of the Commonwealth. And with all due respect, I don't think, I mean, you know, the last three factors we're going to talk about are all supposed to be about protecting the dignity interests of the state. And I think what has to be true is the inquiry that the federal courts use to consider those factors has to respect the dignities of the state. I mean, even if they rule against them, they have to be respectful of the dignity interests of this co-equal sovereign. And it's not for Mr. Ryan or anybody else to say that, well, the way you're doing your contract approval, your disbursement approval, isn't sufficiently rigorous. It's a pro forma process. All that matters is it's the same process that the Commonwealth uses for its other agencies. What about the audit processes for other agencies? Does the record show that other agencies are audited with such minimal oversight or at least incidence of frequency than FIA has been? Judge Keenan, I don't think the record shows anything about that one way or the other. As I say, on the contract review process, the disbursement review process, the testimony is, which is unrebutted, is, in fact, it is exactly the same process. On the audit, we just don't have testimony one way or another on that. I think the critical thing on the audit, though, is that, first of all, I think on the audit, it is the capacity to audit any year, not the fact of how often they audit that probably ought to be the most important factor. I certainly would agree that if every other state agency were audited every other year and FIA gets audited only once, that that might be a significant consideration. I'm not going to disagree with that, Your Honor. It's just that the record is silent on that. I just don't know. And I think in this case it may be different in Paley. I think on this case the burden is actually on the plaintiff to establish that you have a Federal Claims Act person. And so from that standpoint, I would submit that if the record is silent on that, that does not inure to our detriment. Speaking of persons, what about FIA's assertion in other federal litigation of its personhood status? Would you like to comment on that? Well, I would. And, you know, I'd like to say, you know, we're sorry, we made a mistake. I don't think, to your question, I don't think it was a matter of, you know, asserting that we were a person as such. We filed a couple of diversity actions. The issue was not joined. It wasn't the other side sort of didn't focus on the fact. We didn't focus on the fact. The issue was never joined. So it's kind of the litigation equivalent of a drive-by jurisdictional ruling where, you know, the court exercises, you know, jurisdiction in a case, and maybe it turns out after the fact that there was no standing. I think if you compare what the practice was in those two cases to what happened in Hoover, I mean, this is small beer, but compare it to Hoover. In Hoover, it was the Hoover suit itself that the state agency initiated as plaintiff in federal court under diversity jurisdiction, and only after they lost on a statute of limitations decision did they say, oh, hey, you know, what are we doing here? We want to do over in state court. And this court reluctantly recognized that, you know, in that context, it's a jurisdictional inquiry and sort of shame on you is not a principle. So I'm here to represent that, you know, now that the issue has been focused on, you know, unless it's another mistake, it's not going to happen again. And we're not trying to have our cake and eat it too here. We do understand that this has consequences both when we sue as a plaintiff and when we're a defendant, especially since I'll have an opportunity to back up or I don't want to burden the court for it. Okay. Thank you. All right. Thank you, Your Honor. Just on the specific of the audit, Judge Keenan, other agencies come before the legislature each year with their budget. FIIA does not. So there's a significant oversight in the budgetary function that does not apply to FIIA. It sets its own budgets and it doesn't have to clear them with anybody. Now, there's been a lot of talk about speculation in the record by different people. FIIA's thesis has always been our money is the state's money, which is contradicted by the statute since they have to pay by statute all their obligations with their own money. They are fenced off. They have their own money. And this idea that these administrative routines that they run through with the treasurer or the attorney general are significant is contradicted by the statements of those agencies that say, we do not use those to control the business of FIIA. And this idea is similar to saying, well, when I put my money in the bank, this is FIIA logic, put my money in the bank and now I draw a check on the bank and somebody looks at it and says, well, is it properly signed? Has it got the right date on it? Well, now that's a veto. And then when the bank issues the payment, well, my gosh, the bank is liable. The bank's not liable. It's my money and it's FIIA's money. And that's what the record showed. And as to the ultimate question, the speculative question, what would happen if a judgment of enough magnitude to put FIIA into a bankruptcy-type position would occur? Mr. Adolph has no authority to speak to that. That was his own view. He's not a qualified expert and he really has just makes a statement because he thinks that's going to help his client. He's a director. But the fact is there's no evidence to support that. And it was fenced off for that very reason, to ensure that the state would not bear the consequences. And Hess is significant because Hess distinguishes between the risk of impairing the state's function and contributions that their report authority was making to the state. So I think that Justice Ginsburg dealt with that and said those don't matter. The Eleventh Amendment protects the state against the impairment of its ability to function. That is not the issue here. There are huge judgments. The state would make its own decisions. Its decision would be, do we want to pay that judgment and rescue this particular agency? Is there anything about it that really says we must have it? Or could we say, okay, if we're going to have to pay our tab for administering our programs, we'll do it. And there's nothing unique about FIIA. They're unlike those agencies which have been deemed for functional liability. They're not unique. The administration of grant programs can be done by banks, other agencies. They can put it out for bid. So there's nothing that characterizes it in the way HUDO is characterized. So if we go to a couple of broad things, as Mr. Clement said, it talks about context. This is really governed by the duck rule.  If you look at this enterprise, it's a massive financial enterprise. Ninety percent of its energies are devoted to be in business. The business is nationwide. The business serves the interests of the federal government and students not only in this country, but they went out to the Caribbean, hardly the business of Pennsylvania. Whatever it might have been as conceived at the beginning, sealed off, yes, but basically administrative has changed radically over time. And that really does matter when this court sent the case back to look at the real world. Now, the things Mr. Clement raised, the powers that are accorded to the attorney general, the treasurer, were before the court the last time because it's all in the statute. And the court looked at that statute and said insufficient. They don't tip the second factor in favor of FIIA. And while FIIA says they don't have the burden, ultimately they don't. It's part of the claim for relief. But on summary judgment, they do have the burden. They have the dual burden, no disputed issues of fact, and judgment is a matter of law. So the burden is theirs. It's not ours. So when we come down to what is this agency, I think based on the rulings before, we now have the third factor reversed because the ruling before was we could not show that the majority of its effort was directed out of the state. We have now shown that. With the second factor now moving in our direction because once we investigated how it operated in the real world, which is what the court wanted to say, it has huge autonomy. In that regard, the ability to be self-funded, to set your own priorities, your own budgets, make your own business decisions, has always been deemed to be determinative. And then the first factor, nothing came out that was not in the record before. It's all speculation as to what might happen. And this and that, it all is this technicality of if funds, and not all their funds, but some of their funds are in the state treasury, then it's the treasury, not them, that's paying. When the statute itself says money is in the treasury, our fee is money. Because if all the money was state money, they couldn't satisfy their statutory obligation to pay their expenses out of their own monies. That's where they pay everything. So the mere fact that pro forma that check goes out of the treasury doesn't constitute a veto power, doesn't constitute a control, whether or not the state might have historically decided, yes, let's be more rigorous, let's examine the business functions, the state decided to the contrary, has kept that in being for 50 years. I think we have a very important record as to what FIA actually does. And the last thing is on these two, oops, you know, we claim to be a citizen of the state. We didn't mean it. And the case really is that it will be Beckett. It's not Hoover where they reversed themselves. The state authority didn't. I think on that, in that situation, it is significant that they... I need you to wrap it up as well. Okay, it's wrapped. Okay. Thank you. We'll come down and greet counsel and then go into our next case.
judges: William B. Traxler, Jr., Roger L. Gregory, Barbara Milano Keenan